BEFORE THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,            .
                                     .   Case Number 22-cr-197
          Plaintiff,                 .
                                     .
      vs.                            .
                                     .   Washington, D.C.
GEOFFREY SAMUEL SHOUGH,              .   March 22, 2023
                                     .   2:23 p.m.
          Defendant.                 .
- - - - - - - - - - - - - - - - -

TRANSCRIPT OF SENTENCING HEARING
BEFORE THE HONORABLE DABNEY L. FRIEDRICH
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the United States:      JORDAN KONIG, ESQ.
                            U.S. Department of Justice
                            P.O. Box 55
                            Ben Franklin Station
                            Washington, D.C. 20044

For the Defendant:          KATRYNA SPEARMAN, ESQ.
                            Lowther Walker LLC
                            101 Marietta Street NW
                            Suite 3325
                            Atlanta, Georgia 30303

Official Court Reporter:    SARA A. WICK, RPR, CRR
                            333 Constitution Avenue Northwest
                            Room 4704-B
                            Washington, D.C. 20001
                            202-354-3284

Proceedings recorded by stenotype shorthand.
Transcript produced by computer-aided transcription.

```
 1                      P R O C E E D I N G S
 2           (Call to order of the court.)
 3              COURTROOM DEPUTY:  Your Honor, we are in Criminal
 4      Action 22-197, the United States of America versus Geoffrey
 5      Shough.
 6          If I can have counsel please approach the podium and state
 7      your name for the record, starting with the United States.
 8              MR. KONIG:  Good afternoon, Your Honor.  Jordan Konig
 9      for the United States.
10              THE COURT:  I'm sorry.  I didn't catch your last name.
11              MR. KONIG:  It's Konig.
12              MS. SPEARMAN:  Good afternoon, Judge.  Katryna
13      Spearman for defendant Geoffrey Shough, who appears with me in
14      person today on conditions of bond.
15              PROBATION OFFICER:  Good afternoon, Your Honor.
16      Jessica Reichler on behalf of the United States Probation
17      Office.
18              THE COURT:  Good afternoon, Ms. Reichler.  I didn't
19      expect you to be here.
20          We are here for sentencing.  I have reviewed the
21      presentence report and the Probation Office's recommendation.
22      I've also reviewed the parties' sentencing memoranda.  I've
23      reviewed all the exhibits, the half a dozen or so letters
24      submitted in support of Mr. Shough, and the government's
25      sentencing chart and videos.  I watched all those videos.
```

```
1          Did the defense have any videos they wanted me to watch in
2     addition to those provided by the government?
3               MS. SPEARMAN:  No.
4               THE COURT:  Thank you.
5          And the government is making these videos available to the
6     public?
7               MR. KONIG:  Yes, Your Honor.  We will upon the Court's
8     request.
9               THE COURT:  Okay.  Thank you.
10         All right.  Ms. Spearman, have you reviewed the presentence
11    report with your client?
12              MS. SPEARMAN:  Yes, Judge, I have.
13              THE COURT:  Mr. Shough, have you had a chance to read
14    the PSR and had adequate time to talk to your lawyer about it?
15              THE DEFENDANT:  Yes.
16              THE COURT:  And remind me again how his name is
17    pronounced.
18              MS. SPEARMAN:  Shough like tough.
19              THE COURT:  Shough like tough.  I'm sorry, Mr. Shough.
20         Mr. Shough, you said you've read the PSR, and you've had
21    adequate time to talk to your attorney about it?
22              THE DEFENDANT:  Yes, Your Honor.
23              THE COURT:  And you've had a chance to correct any
24    errors in the report?
25              THE DEFENDANT:  Well, go ahead.
```

1          MS. SPEARMAN:  Ma'am, the only outstanding error, I

2     believe, is that it does list Mr. Shough as a Department of

3     Defense contractor.  This is going to sound incredibly nitpicky,

4     but he was a contractor to a consulting company to --

5          THE COURT:  I understand.  You made that point in your

6     sentencing memorandum.

7          MS. SPEARMAN:  He did not work directly with the

8     Department of Defense.  He worked for a consulting company who

9     worked for them.  He did not have --

10         THE DEFENDANT:  No classified materials or anything.

11         THE COURT:  Okay.  That's not a -- I picked up on that

12    from your sentencing memoranda.  That's not anything that's

13    material to my sentencing here.

14         MS. SPEARMAN:  Correct.  It does not affect the

15    guidelines or anything.

16         THE COURT:  You didn't file any objections to the PSR?

17         MS. SPEARMAN:  No, ma'am.  We have no objections.

18         THE COURT:  Aside from that, there's nothing that you

19    would correct?

20         MS. SPEARMAN:  Correct.

21         THE COURT:  That's right, Mr. Shough?  That's the only

22    factual inaccuracy?

23         THE DEFENDANT:  That's my understanding, Your Honor,

24    yes.

25         THE COURT:  You've looked at it yourself.  You didn't

1    see anything else?

2            THE DEFENDANT:  Not that I recall.

3            THE COURT:  Okay.  All right.

4        And the government -- does the government have any

5    objections to the PSR?

6            MR. KONIG:  No, Your Honor.

7            THE COURT:  All right.  So I will accept the

8    presentence report as my findings of fact pursuant to Rule 32 of

9    the Federal Rules of Criminal Procedure.

10       The parties have agreed, consistent with the plea agreement

11   and the PSR, that the relevant guideline is Section 2A2.4.

12       Beginning on page 9 of the presentence report, the

13   Probation Office has calculated Mr. Shough's sentencing

14   guideline range.  The Court has reviewed this independently and

15   agrees with these calculations, to which neither side objects.

16       Correct for the government?

17           MR. KONIG:  Correct, Your Honor.

18           THE COURT:  And for the defense as well?

19           MS. SPEARMAN:  Yes, ma'am, correct.

20           THE COURT:  Okay.  So the Court will add to the base

21   offense level of 10 a three-level enhancement for physical

22   contact based on Mr. Shough forcibly entering the Capitol during

23   a breach of the Senate Wing Door.

24       He's entitled to acceptance of --

25           THE DEFENDANT:  Your Honor --

1          MS. SPEARMAN:  You have to let her finish this part.

2          THE COURT:  Mr. Shough, I'm guessing that you're

3    taking issue with the forcible entry.  I'm relying on the

4    Statement of Facts to which you swore to.  Paragraph 4 says,

5    "Shough forcibly and unlawfully entered the U.S. Capitol

6    building."

7          THE DEFENDANT:  Your Honor, I think we agreed to the

8    enhancements, but as the prosecutor, Jordan, was explaining, I

9    thought he made it clear to me that I could still be elected for

10   the physical contact section if I was pushed inside.

11         THE COURT:  I'm sorry.  Can you speak into the

12   microphone?  It's hard to hear you.

13         THE DEFENDANT:  Sorry.  Can you hear me, Your Honor?

14         THE COURT:  Yes.  Do you want your attorney to speak

15   for you, sir?

16         THE DEFENDANT:  No, I --

17         THE COURT:  Why don't you all chat for just a moment

18   here.

19      (Defense counsel and defendant conferred.)

20         THE COURT:  Ms. Spearman, is there anything else that

21   either you or Mr. Shough would like to add?

22         MS. SPEARMAN:  No, Your Honor.

23      Other than using the "forced others inside," we're sticking

24   with the phrasing of "involved physical contact."  He does not

25   object to the fact that there was physical contact, that he had

1    physical contact.

2         I think the videos will also that Mr. Shough was at the

3    front of the line --

4              COURT REPORTER:  Counsel, I need you to speak into the

5    microphone.  Thank you.

6              MS. SPEARMAN:  I am so sorry, Madam Court Reporter.

7    Thank you for asking me.  And I will also slow down.

8         So we do not object to the use of physical contact

9    enhancement.  I believe the videos that the prosecutor is going

10   to show will also show that Mr. Shough was at the front of the

11   line, with others pushing behind him.  I think his issue with

12   the term was that he "forced" others inside.

13             THE COURT:  I didn't say that.  I said he forcibly

14   entered the Capitol building, and that's exactly what he swore

15   to when he entered his plea.

16             MS. SPEARMAN:  And we perfectly stipulate to that.  I

17   appreciate the opportunity to clarify.

18             THE COURT:  So the total offense level would be 11.

19   Mr. Shough has no criminal history.  And that makes his

20   guideline range eight to 14 months.

21        Correct?  Both sides agree with that?

22             MR. KONIG:  Yes, Your Honor.

23             THE COURT:  Ms. Spearman?

24             MS. SPEARMAN:  Yes, Judge.

25             THE COURT:  All right.  Okay.  And again, I've

1    independently calculated the guidelines, and I believe

2    Probation's calculations are correct.

3        So I will hear first from Mr. Konig.  And if you could

4    please focus -- you can allocute in any way you want, but what

5    I'm most interested in you spending most of your time on is the

6    comparison to similar cases in this district.

7        And I have a couple of questions about one that I handled.

8    I don't think that was mentioned in your sentencing memorandum.

9    And there was another one Judge Boasberg handled, the Mostofsky

10   case.

11            MR. KONIG:  I'm certainly familiar with the Thompson

12   case that the Court handled.

13            THE COURT:  You mean the Johnson?

14            MR. KONIG:  Daryl and Daniel Johnson, correct.

15            THE COURT:  All right.  I'm happy to hear anything

16   else you want to say, but I have read both sides' sentencing

17   memoranda.  So I don't really need you all to repeat what's

18   stated in there.

19            MR. KONIG:  Yes, Your Honor.  I do want to address

20   briefly the nature and circumstances of the offense and

21   particularly in light of Mr. Shough's, I guess, continuing

22   difficulty in the language that the Court has used, that I have

23   used, that we have agreed to on his conduct on January 6 of

24   2021.

25        In his sentencing memorandum, he claims that he was not a

1    planner, merely a minor participant who stumbled into the

2    building and claims again that while the events surrounding and

3    occurring on January 6 are serious, he claims that his

4    involvement was not.

5         We don't believe that to be the case.  We think that the

6    objective evidence is that Mr. Shough was a part of this group

7    that overran the officers on the Capitol grounds and that he

8    himself was a part of a group that forced its way in, through

9    the pressure of the mob, through a barricaded door, into the

10   Capitol building at around 2:47 or 2:48.

11        THE COURT:  And was that the initial breach of those

12   doors?  It's later than an earlier breach on the west side;

13   right?

14        MR. KONIG:  That's right.  It's the same door that was

15   breached around 2:13 by Dominic Pezzola and that crew, where I

16   think --

17        THE COURT:  Reffitt started it?

18        MR. KONIG:  Yes.

19        THE COURT:  So that door, but then they secured it,

20   and they breached it again.

21        MR. KONIG:  Yes, Your Honor.  It was secured, and then

22   it was rebreached at 2:48.  2:48 happens to be a time around the

23   building where a lot was going on.  Probably much has come up in

24   the Court's prior cases.  Around the East side of the Capitol

25   and the Rotunda, officers were pushing rioters out through the

1    Rotunda door, which I'm sort of circling here.

2        I've got sort of a visual aid of the Capitol building just

3    to kind of orient the Court to where things were going on and to

4    where Mr. Shough's conduct took place.  So the picture I have is

5    something I got off the Internet that somebody had created

6    showing a schematic of the Capitol on January 6 of 2021.

7        The view from the bottom to the top is as if the Court

8    walked out the Annex --

9            THE COURT:  I understand.  I'm familiar with this very

10   well from other cases.

11       So it's the left side?  It's the northwest side where they

12   breached?

13           MR. KONIG:  Yes.  It would have been, I believe, where

14   this little arrow is that I'm pointing to that says "northwest

15   courtyard."

16           THE COURT:  Are you going to give a copy to the Court

17   for this purpose?  I'm just inviting you to for the record, if

18   you would like.

19           MR. KONIG:  I could provide it.  This may be an

20   exhibit in the Reffitt trial.

21           THE COURT:  If it's the same door, I know exactly

22   where you are.  It was confusing to me because I do think I read

23   somewhere it was the second breach, and it did seem after the

24   initial.  So that makes sense.  It's that very door.

25           MR. KONIG:  Yes, yes.  And this picture that I'm

1    showing in little red arrows shows the different breach sites.

2        So next to the Senate Wing Door, there's an arrow that goes

3    to the left.  And that's the Parliamentarian Doors.  In a video

4    that I will be playing briefly, you can see at the very time

5    that Mr. Shough and his compatriots were breaching the Senate

6    Wing Door, the Parliamentarian Door was overwhelmed and people

7    were running through the Parliamentarian Door.

8        Some individuals have claimed that it's evidence that

9    officers had let them in, because officers were defending the

10   Senate Wing Door at the time.

11        THE COURT:  So why is this aggravating for Mr. Shough?

12   Obviously, I see the videos.  I see the line of officers.

13   Is there any other relevant point here to make in giving me the

14   full context at that moment other than the Capitol was well

15   under attack?

16        MR. KONIG:  And that is the context, the Capitol was

17   well under attack.

18        THE COURT:  I've got that.

19        MR. KONIG:  As the Court is aware, and I will show a

20   video briefly, Mr. Shough was first, I guess, identified in

21   video being near the northwest lawn at about 1:55.  There's

22   actually -- and I will play it in a moment, but there's a video

23   from the Reffitt trial where Guy Reffitt is engaged with

24   officers --

25        THE COURT:  Motioning people.  He's helping --

1    Shough's helping people climb up.

2            MR. KONIG:  He's waving a flag.  A few minutes later,

3    he is helping people over that --

4            THE COURT:  So I've watched all that video.  I've also

5    watched the video that he made of himself.  So if you want to

6    just summarize those, I don't think there's a need for me to

7    watch them again.

8            MR. KONIG:  Okay.  Then I will summarize.

9        Exhibit 8 shows that Mr. Reffitt was -- as Mr. Reffitt was

10   engaging with the officers and then another rioter who has been

11   identified as Christopher Alberts is running up with a wooden

12   pallet towards the officers and then another individual pepper

13   sprays them, Mr. Shough is waving a flag and cheering them on.

14       A few minutes later, in Exhibit 9, which we approximate at

15   about 2:00 based on where the other rioters are, Mr. Shough is

16   helping people over that wall.  A woman is yelling, "We need

17   more.  It's not over."  Those individuals -- and I will blow it

18   up a little bit on this map -- they're right here near where it

19   says "storage tent."  And that tent is actually pushed over in

20   one of the exhibits, as Mr. Shough in another exhibit goes and

21   is actually confronting officers with other individuals.  And

22   you get a little glimpse of him confronting those officers.

23       We believe what he said is essentially what he said in

24   Exhibit 2 when he was interviewed up near the Senate Wing Door

25   where he says, "I just told the officers get out of the way and

1    go home."

2         I should note for the record, I tried to transcribe that in

3    the sentencing memo, and I think I mistranscribed it, having

4    rereviewed it.  I think he said, "I was trying to show them

5    love," and I transcribed it as "shove them off."  I think he

6    said "show them love."

7              THE COURT:  And he talked about millions are coming.

8              MR. KONIG:  Right.

9              THE COURT:  So your overarching point here is that he

10   did forcibly enter, and he intentionally went in the Capitol and

11   was part of the mob that used force, even though it's not clear

12   from the video, the perspective we have watching it now, that he

13   was a willing participant in the scrum.

14        You're saying all of the surrounding circumstances,

15   including what he was wearing and everything else, shows he

16   wanted to get in, and he was prepared to use force to do so?

17             MR. KONIG:  I think it's actually clear from the

18   videos as well.  He goes up to that area near the Senate Wing

19   Door in plenty of time before its breach.

20             THE COURT:  He's in the front.

21             MR. KONIG:  He's up there.  There's a picture from a

22   *New Yorker* article where somebody behind him is breaking a

23   window with a wooden object.

24        And then in Exhibit 12, you can see him sitting -- about

25   four minutes before he actually breaches, he's pulled up his

mask.  He's clearly not in a mass of people unable to move.

And then --

THE COURT:  And the mask had been down before?

MR. KONIG:  It had.  And it was up, as far as I can
tell, from his entry throughout his presence into the building,
but not before.

In Exhibit 13, which we shared recently because it was used
in a trial very recently in this court, I had not seen it before
that, but you can actually see a side by side, and you can
actually see him waving the Texas flag as the door -- the Senate
Wing Door is being broken by rioters, as rioters are yelling, as
the officers are using bright lights and pepper spray, and
throwing objects at the officers.  The video is from about 2:42
until almost 2:46.

And then there's a particular video, Exhibit 15, which is
at 2:47, and you can see he's in this group of people.  You can
actually see in that exhibit his helmet.  He didn't get there by
accident.  He was -- there was a lot of time that, had he not
intended to get into the building, had he not intended to be a
part of that group, he could have --

THE COURT:  Sure.  But I think his point is going to
be not that he never intended to get in, but he didn't intend to
use force to get in, and he was just a part of this mob that got
pushed along.

Can it be both?

1          MR. KONIG:  I think that's belied by the video

2    evidence.  I think you would have to put yourself in the front

3    line of a couple of people to be in the front -- of a couple of

4    people.  You can see in the videos there are people to either

5    side.  There are people behind him.  A few minutes earlier, he's

6    got his back against a pillar.  So he's not in the front of the

7    group a few minutes earlier.  You know, in the video, you can

8    see him waving a flag.

9          And the same claim was made before the Court, I believe, by

10   Daryl Johnson, and the Court said that she was having a hard

11   time accepting that characterization, that it was -- you know,

12   that him going in a different door was a result of just the

13   people around him and that Mr. Johnson could be held accountable

14   even if he wasn't the one who initiated it.

15         And I think in this case -- and I watched a little bit of

16   the Johnson video today to kind of familiarize myself with that.

17   In this case, it was a little even more egregious, because

18   that's how the individuals got in.  The officers had barricaded

19   that door.  It had been resecured.  They barricaded it with some

20   wooden objects, and they were all standing there holding in

21   front of the door.  And the only way for the rioters to get in

22   was through that mob action of getting in.  An individual person

23   could not have gotten in.

24         And I would say the other way of thinking about that is

25   that any individual in that group could make the same argument,

1    that they were being pushed by the people behind them.  In fact,

2    one of the exhibits, I believe it's Exhibit 14, the actual entry

3    of Mr. Shough, it actually shows as he gets in, and he's very

4    clear in frame, he's actually pushing an individual in front of

5    him.

6              THE COURT:  It's not an officer, but it's someone

7    else?

8              MR. KONIG:  Yeah, it's a younger black man who had

9    previously actually hit officers trying to get in.  That

10   individual actually can be seen on the way out in one of the

11   other exhibits.  Mr. Shough didn't leave, though.  He didn't do

12   the things you would expect of somebody who unavoidably got

13   himself caught up in a wave of humanity.

14             THE COURT:  He talked to the officers in an animated

15   way.  We don't know -- you can't proffer what was said there,

16   can you?

17             MR. KONIG:  I can't.  He has.  He has said generally

18   what he was telling the officers.  He told the Court at his

19   re-arraignment that he was telling the officers that they should

20   stand down generally and that they should call then-President

21   Trump, they should call their supervisors because those

22   individuals would tell them to stand down, sort of what he said

23   earlier, that they should go home, that it was -- that they were

24   not either needed or wanted there at the time.

25             THE COURT:  And then he joins the chant inside?

1          MR. KONIG:  I'm not sure if he joined the chant.

2          THE COURT:  Well, his arms were moving kind of outside

3     the frame.  I watched this all very carefully.

4        Once he's in, you agree there's no additional aggressive

5     behavior on his part, correct, that you're aware of, that you

6     can prove?

7          MR. KONIG:  Yeah, no, I think any -- we don't know

8     what he said, but it's very clear that he was engaged in

9     conversation or standing in front of the line of officers.

10        There was -- I want to make sure I have the right exhibit

11    number, Exhibit 16, which actually shows Mr. Shough's --

12    essentially, the entire path he took on the way out from about

13    the beginning of that exhibit through 6 minutes and 20 seconds

14    in.  You can actually see him first, he's standing near the

15    officers as the crowd is filling in, and then he leaves

16    towards -- it would be --

17          THE COURT:  He's walking towards the center of the

18    Capitol?

19          MR. KONIG:  Yeah, towards the center of the building,

20    and the person who is filming actually is behind him.  And you

21    actually see Mr. Shough is no longer visible after 6 minutes and

22    20 seconds, but the person takes the exact same path that

23    Mr. Shough did out of the building.

24          THE COURT:  So talk to me a little bit about

25    Mr. Shough's remorse immediately after the event.

```
 1           MR. KONIG:  Well, Your Honor, this is a tough one.  I
 2   don't think Mr. Shough is being willful.  I think he genuinely
 3   believes everything that he has said and he's going to say to
 4   the Court.  He does not believe that he did the things that the
 5   videos seem to show him doing.  He believes that he was caught
 6   up in this, that possibly nefarious people with nefarious goals
 7   caused him and he regrets that he allowed himself --
 8           THE COURT:  To be in the front, yeah.  Okay.
 9       What about -- has he been interviewed by the FBI?
10           MR. KONIG:  He has.
11           THE COURT:  And in terms of his remorse, you're saying
12   he's, in your view, minimizing his actions, but you think that
13   it's an honestly held belief on his part?
14           MR. KONIG:  I think it is an honestly held belief.  I
15   don't think it is what one would normally refer to as contrition
16   or taking full responsibility.  He has pleaded guilty.  He
17   has -- you know, very quickly.  He has met with the FBI, and
18   he's provided information that he thought would be useful for
19   the FBI.  And I think he truly believes that he didn't mean to
20   go in the building.
21           THE COURT:  Did he have an explanation for all of his
22   tactical gear?
23           MR. KONIG:  His explanation is generally that he was
24   using it defensively, that he believed that there were going to
25   be, for example, Antifa or someone else --
```

1          THE COURT:  And he said that to the FBI?

2          MR. KONIG:  Yes.  And so that his -- it wasn't really

3     body armor, but it was a jacket with, he says, Kmart --

4          THE COURT:  Do you know one way or the other?

5          MR. KONIG:  I think he probably is telling the truth.

6     I don't think it would constitute body armor under the law

7     certainly.  And his -- he says this was bicycle gear because he

8     is a cyclist.  This was his -- or motorcyclist, sorry,

9     motorcycle gear.

10          THE COURT:  Could the goggles have been put up because

11     he's getting pepper spray around him at that door area?

12          MR. KONIG:  What's that, Your Honor?

13          THE COURT:  You made a point that the goggles were

14     raised or the mask.  Could it be because there was a lot of

15     pepper spray in the air at that point?

16          MR. KONIG:  Your Honor, the goggles, to my knowledge,

17     were on the entire time.  It was the gaiter that he was wearing

18     that was raised.  And to me, that suggests some foreplanning of

19     going inside.

20          THE COURT:  Sure.  So you think as he stands here he's

21     still going to tell the Court he had no intention to ever go

22     inside, he got pushed inside?

23          MR. KONIG:  Yes, Your Honor.

24          THE COURT:  All right.

25          MR. KONIG:  And it made it difficult for us to --

1  acceptance of responsibility, particularly in this circuit, is

2  relatively freely given, and I think he certainly in this

3  circuit --

4       THE COURT:  He's admitted the elements.  But is he

5  generally remorseful and accepting full responsibility in the

6  broader sense?  The government thinks no because there's

7  abundant evidence he intended to get in the Capitol.

8      All right.  I just want to press a little bit on this

9  point.  You think he intended to get in the Capitol.  Do you

10  also think he intended to use force in that scrum?

11       MR. KONIG:  Yes, Your Honor.  I think that he intended

12  to be a part of that scrum to get into the building, that the

13  videos don't show him turning around, they don't -- while in the

14  scrum.  They don't show him not getting in that group.

15       THE COURT:  Could he have pushed the guy away in front

16  of him because he was upset because he had pushed officers?

17       MR. KONIG:  That's not what the video showed.  The

18  video was, as everyone's getting in and certain individuals are

19  tripping over the wooden barricade, somebody falls to the right

20  of Mr. Shough.  The entire group comes in, and Mr. Shough has

21  somewhat of a defensive posture, and he's kind of standing like

22  this toward the person right in front of him.

23      It doesn't show somebody who got there by accident, and it

24  shows that he was there because he intended to tell the officers

25  to go home, to --

1          THE COURT:  So maybe to go in to just say "get out of

2     here" but perhaps turn around and go out but he couldn't because

3     everyone was going through the door?

4          MR. KONIG:  It's certainly possible, except for the

5     person that was directly in front of him when he went in goes

6     out in the beginning of one of the other videos we have minutes

7     before Mr. Shough leaves.  Mr. Shough was in the building for

8     around 15 minutes.

9          THE COURT:  So you're saying one of the members of

10    that crowd actually did go out in that area right away, so it

11    was possible to get out there?

12         MR. KONIG:  Yes, Your Honor.

13         THE COURT:  Okay.  Let me move on.

14     You seem familiar with the Johnson case.  I will just say

15    that the father there I looked at very differently than the son.

16    The son, you know, had a record.  The father had an impeccable

17    past, as does Mr. Shough.  Yet, the Court saw no evidence that

18    they planned to enter in any way.  And with Mr. Shough, it's

19    harder to reach that conclusion, for all the reasons we've

20    discussed here.

21     So can you -- in that case, I want you to focus more on the

22    four-month sentence the Court imposed and how the government

23    views this case as more aggravated or less aggravated than that

24    case.

25         MR. KONIG:  Yes, Your Honor.  And I think this goes to

1    a broader point I wanted to make as well, which is, the Johnsons

2    both were sentenced under a guideline range of zero to six

3    months.  They both had a criminal history category of I, like

4    Mr. Shough.  But they did not have the three-point enhancement

5    for physical contact that the Court has found applies and that

6    the defendant agrees applies.

7              THE COURT:  Right.  And that -- my recollection in

8    that case was that they were at the very back of the mob.

9    What's more aggravating, in the Court's view, about that case is

10   the officers' backs were to a wall, and it was very dangerous.

11       Yet, they were in the way back.  And I could see clearly on

12   the video a push forward, but they were not in the front

13   actively engaged like 100 people in front of them were or 50

14   people.

15             MR. KONIG:  And it was hard for me, just looking at it

16   without the benefit of hearing the testimony that the Court

17   heard, but to the best of my understanding, they were inside

18   the --

19             THE COURT:  They were inside, and they were trying to

20   get the doors open to let more in, and the officers were

21   sandwiched between two mobs.  So it was a very dangerous

22   situation.

23             MR. KONIG:  Yeah.  You know, the difference factually

24   between that is simply the -- Mr. Shough was a part of the mob

25   that forced its way in versus -- it was a smaller concentration

1    of area, but --

2            THE COURT:  Because he's closer to the front.

3            MR. KONIG:  He is, but also, in the Johnson case, that

4    area near the Rotunda Door, the officers were essentially

5    getting sandwiched.  They were -- the individuals outside were

6    pushing in, and the individuals inside were pushing out.

7            THE COURT:  Which is an aggravating factor, in my

8    view.

9            MR. KONIG:  It is, though it's harder to assign

10   culpability to the participants.

11           THE COURT:  I don't know.

12           MR. KONIG:  I don't know how close to --

13           THE COURT:  The doors were shut.  So I think the

14   people on the inside were very much accountable for the risk.

15           MR. KONIG:  But it struck me that the Johnsons were

16   not the individuals who were -- that they were some way back.

17           THE COURT:  They were very far back.

18           MR. KONIG:  And for that reason, there was no

19   enhancement for the physical contact, which is really the

20   difference in the sentencing range here and our recommendation

21   here.

22           THE COURT:  But also unlike Mister -- I think it was

23   Daniel, he did have a little bit of a record, my recollection.

24           MR. KONIG:  He did.

25       In fact, as a broader point, the defendant submitted a

1    table in his sentencing memorandum discussing generally the

2    ranges of sentences in plea agreements that went to sentencing

3    under 18 U.S.C. 231(a)(3).

4         There are 13 cases that are cited there.  Only six of them

5    include the plus 3 for physical contact.  Of those six, one of

6    them actually was a higher guidelines range, because that

7    defendant, Matthew Capsel, actually assaulted officers, and a

8    cross-reference applied.  So he actually had a higher total

9    offense level, and he had a criminal history category of II.

10        Another of those defendants, Ronnie Presley, he had already

11   served 17 months in pretrial detention, and he also had a

12   criminal history category of II.  So a downward variance there,

13   I guess, to the Court made some sense.

14        So there were only four in that table of 13 that had the

15   same guidelines range as has been agreed to in this case.  The

16   three cases that we cited in our sentencing memorandum, which

17   are Cook, Romaro, and Fairchild, and then an individual named

18   David Blair, in that case, the government recommended a low-end

19   sentence, an eight-month sentence, and the Court imposed a

20   five-month sentence.  That -- I just read the press accounts of

21   that and read a sentencing memo on it.  So I don't know -- I

22   have not read a transcript.

23        But that individual had -- later in the day, when the

24   officers were enforcing the curfew and trying to get rioters off

25   the Capitol grounds, he had attacked officers with a lacrosse

1    stick with, I believe, a Confederate flag on it and was met with

2    some police force where he was actually hospitalized, had a

3    concussion and lacerations on his face.  He also, I believe, was

4    18 years old.

5         And so I think both the government and the Court there

6    believed that lower than mid-range --

7              THE COURT:  Which judge is that?

8              MR. KONIG:  That is the Blair case.

9              THE COURT:  Okay.  All right.  Tell me what you

10   think -- you say -- the government seems to think it's most

11   analogous to Romaro, Cook, and Fairchild.  I still think it's

12   analogous to Johnson when you take into account the fact that

13   the younger Johnson had a criminal record.  So, you know, do

14   those things sort of cancel one each other out.

15        And Fairchild, Judge Hogan, that case seemed more

16   aggravated in the sense that that defendant helped pull away

17   metal barriers.  He entered after it was already breached;

18   right?

19             MR. KONIG:  Uh-huh.

20             THE COURT:  He had six criminal convictions.  Judge

21   Hogan imposed a six-month sentence there.

22        I'm really, as you know, trying very hard to be consistent

23   internally.

24             MR. KONIG:  The best of my understanding --

25             THE COURT:  In other words, I'm not at 11 months.  You

1    know that; right?

2           MR. KONIG:  I understand, Your Honor.

3           To my understanding, Judge Hogan credited a lot the time of

4    that plea and the timing of that sentence, that it was an early

5    plea and an early sentencing, that at the time Mr. Fairchild was

6    the first defendant to appear before him to express genuine

7    remorse and actually speak of the victims on January 6 of 2021.

8           He appeared to give a lot of credit to Fairchild's military

9    service which had resulted in PTSD.  And so he did impose a

10   sentence of six months.

11          So, again, as one of the few cases to be a 231(a)(3) with a

12   plus 3, it is certainly a comparator.

13          We think that -- we think that the guidelines, particularly

14   in these cases, are useful for some uniformity.  And I think

15   that in the vast majority of cases this Court will see and the

16   district will handle, the U.S. Attorney's Office will probably

17   be recommending somewhere within the guidelines for uniformity.

18          THE COURT:  No, I understand.  Sorry.  I want you to

19   finish your thought, but I do have a question on something you

20   just said, but go ahead and finish your point.

21          I understand you're not going to recommend consistently

22   with my cases, but I'm going to press you on my cases.

23          MR. KONIG:  Certainly.  In many ways -- and I think

24   when Judge Pan was on the district court, she said it -- a lot

25   of times that ends up benefiting defendants because the

1    guidelines --

2              THE COURT:  Are high, but not in her view, at least,

3    the seriousness of this offense, yeah.

4              MR. KONIG:  It's not clear that the drafters of 231

5    thought of interfering with, you know, obstructing officers in a

6    civil disorder in the context of a riot at the Capitol building.

7              THE COURT:  Likewise, it's not necessarily clear that

8    the drafters of 1512(c)(2) contemplated this either.  So it cuts

9    both ways.

10             MR. KONIG:  Yeah.  In 231, it starts with a guideline

11   of 10, an offense level of 10, which is significantly lower than

12   most of the other -- certainly the other felony offenses.

13             THE COURT:  Violent assaults, yes.

14             MR. KONIG:  14, I believe, is the beginning of the

15   violent assault, and then you would have 6 for an official

16   victim, and depending on whether there was an aggravated assault

17   with a deadly weapon --

18             THE COURT:  You could have charged, could you not,

19   aiding and abetting assault here?

20             MR. KONIG:  We could have.  These are close cases.

21   And I think my general view is that when I make a

22   recommendation, I try and charge conservatively.

23             THE COURT:  I appreciate that.

24             MR. KONIG:  I don't have a lot of authority, but in

25   this case in particular, I was surprised at the guidelines

1    being --

2              THE COURT:  Where they are, yeah.

3              MR. KONIG:  -- so much lower than a 1512 or a 111.

4              THE COURT:  Or one could say, it's surprising to have

5    the 1512 be as high when there's no violence or property damage;

6    right?  It cuts both ways.

7         So here's the question.  On Fairchild, did you say the plus

8    3 was added there?

9              MR. KONIG:  Yes, Your Honor.  I believe --

10             THE COURT:  And yet, in that case, according to my

11   summary here, the defendant entered the building after it was

12   already breached, so there was no physical force necessary at

13   this point.

14        What was the physical --

15             MR. KONIG:  Mr. Fairchild was on the West Plaza and

16   was involved with the group of individuals who overwhelmed the

17   officers near the bike racks on the West Plaza at around the

18   2:15 time frame.

19        What happened after Guy Reffitt went up the stairs and the

20   group ran up the stairs there is that a group of individuals

21   went around that scaffolding area --

22             THE COURT:  Yeah, outflanked them.

23             MR. KONIG:  And then there were sort of continuing

24   incursions until the officers retreated up to the Lower West

25   Terrace.

1        THE COURT:  Right.

2        MR. KONIG:  Mr. Fairchild was a part of that group

3   that had attacked officers on the West Plaza between the -- the

4   general time frame is from about 2:00 to about 2:35 when rioters

5   are sort of attacking the officers, and then the officers

6   finally retreat through a stairwell up and then into the tunnel

7   at about 2:35.

8        THE COURT:  But, I mean, is this just another example

9   of a different prosecutor coming out a different way with

10  respect to the application of the three-level enhancement there?

11  Because that does not seem on all fours with this case and, in

12  contrast, Johnson where there's not direct contact.

13       MR. KONIG:  There was, if not direct, very close

14  indirect contact in Fairchild with -- using bike racks to

15  assault officers.

16       THE COURT:  So more in line with this case.

17       MR. KONIG:  Yes.

18       THE COURT:  Even though the summary I have said no

19  physical force was necessary at the breach because physical

20  force had already been used.

21     Is that how you reconcile that?

22       MR. KONIG:  I don't believe his 231 was connected

23  to -- Fairchild's was connected to the breach of the building.

24       THE COURT:  Okay.  It was earlier?

25       MR. KONIG:  Yeah, it was a good -- almost an hour

1    earlier.

2            THE COURT:  Okay.

3            MR. KONIG:  Fairchild --

4            THE COURT:  That makes sense.

5            MR. KONIG:  -- about 3:10, so really after Mr. Shough

6    had already left the building.

7            THE COURT:  All right.  I understand.

8        Are you -- am I correct that Mostofsky is in this list of

9    231s, or it should be, or it could be?

10           MR. KONIG:  I don't think so.

11           THE COURT:  I think he was charged with 231 but also

12   two additional offenses, 641 and a misdemeanor trespass offense.

13   So maybe that's not why it's coming up.  It's not just

14   exclusively a 231.

15       Does that sound possible?

16           MR. KONIG:  I think that's right.

17           THE COURT:  So let me just share with you, Judge

18   Boasberg in that case imposed eight months' incarceration.  And

19   like Mr. Shough, Mostofsky was a part of the crowd that pushed

20   against officers who were attempting to keep rioters from

21   entering the Capitol building.  He did plead guilty to these

22   other two offenses as well.

23       He too had no prior record.  His guideline range, though,

24   12 to 18 months, was higher than Mr. Shough's.  And he was

25   literally on the front lines of the attack.

1        And I've looked at Judge Boasberg's, you know, reasons

2   behind his sentence, and he said that "so he was there pushing

3   against police barricades and then was one of the first 25 or so

4   people to enter after the breach of the Senate Wing Door," and

5   he credited the government's term of enthusiastic participation.

6        And that defendant did also pick up a police vest and a

7   shield, and a riot shield.  He didn't break anything or assault

8   anyone.  He stayed inside 20 minutes.  He did little boasting on

9   social media, even though he didn't really show any real remorse

10  following the offense, but the remorse he displayed at the time

11  of sentencing was credited as genuine.  So -- similarly positive

12  letters.  So some other offenses there, an aggravator with the

13  shield, et cetera.

14       I'm just really trying hard to be consistent.

15            MR. KONIG:  I understand.

16       The only case that I'm a little more familiar with that

17  includes -- that's not listed here that includes the breach of

18  the Senate Wing Door at 2:48 where an individual has pleaded

19  guilty or been tried and convicted is Daniel Egtvedt.  He was

20  just sentenced last week by Judge Cooper, I believe.  But he

21  went to trial, and he was convicted of not only a 231 but also a

22  1512 and, I think, the misdemeanors.  So his guidelines were

23  much, much higher.  And he -- and he ended up -- he got a

24  downward variance, but I think he ended up getting 42 months.

25       But that's the only other one that I'm aware of that's sort

1    of the Senate Wing Door at that time.

2              THE COURT:  Mr. Konig, are you a D.C. AUSA?

3              MR. KONIG:  I am a trial attorney with the Department

4    of Justice's Tax Division.  I'm on detail.

5              THE COURT:  So you're having fun doing something

6    different here.

7              MR. KONIG:  It is certainly different.

8              THE COURT:  This is just an observation.  To the

9    extent it's helpful, take it up the chain.  But I just -- the

10   more of these cases we handle, the more apparent it becomes to

11   many of us that the government's good faith-efforts to kind of

12   draw bright lines and be consistent are not working based on the

13   facts of individual cases.

14        And having someone who is thoughtful like you, a single

15   person looking at the charging decisions in all of these cases

16   and trying to make them proportional would be a really terrific

17   thing.

18        From my perspective, it appears that what is getting up to

19   the highest levels are checkmarks, near the Speaker's office,

20   you know.  There's sort of like these thresholds.

21        But you know from the nuanced discussion that we're having

22   about these different cases that you can't possibly capture all

23   of the aggravating and mitigating circumstances with these

24   offenses.

25        And the only way to really minimize the risk of unwarranted

1    disparities in terms of charging and ultimately sentencing is to

2    have the government's charging decisions appear to be more fair,

3    for lack of a better word.

4        And if someone like you could be a point person where they

5    got the full picture, and you're halfway into it, so you can't

6    correct the other ones, but the government might have more

7    success in convincing judges that its recommendations are

8    warranted.  Because I feel like right now there's some

9    benchmarks that are just not granular enough and show enough

10   exercise of prosecutorial discretion to be fair.

11       MR. KONIG:  And your Honor, I appreciate that.  I

12   should note so you know, in this case and in every case, both

13   our charging decisions and sentencing decisions are a part of a

14   really thorough and thoughtful determination by not just the

15   line attorneys.

16       In this case, for example, you know, when we -- I

17   proposed -- there were charges proposed, discussion.  It goes to

18   a management mailbox, and management who has supervision over

19   all of the cases compares it --

20       THE COURT:  I know.  But that manager is only so good

21   as the information fed to him or her.

22       MR. KONIG:  Certainly.

23       THE COURT:  And I'm sure you're very thorough.  I can

24   tell.  This is why I'm having this conversation with you,

25   because there's a degree of mastery of the facts and

1   thoughtfulness about the distinctions.

2       And I would imagine, as many cases as the AUSAs are

3   handling, not every case is getting that same degree of

4   attention to detail, I should say.

5           MR. KONIG:  As far as I know, they are.  It's a pretty

6   standardized system.  In this case, it certainly was a

7   consideration to charge it as an aggravated assault, and it was

8   not charged an aggravated assault --

9           THE COURT:  And to be clear here, I'm not criticizing

10  this case.  I'm really talking about other cases and just

11  appreciating the ability you have, because you've thought about

12  these, and maybe everybody's being warned that you better know

13  these cases, so it's not fair for me to credit you.

14      But I just -- it's just a thought.

15          MR. KONIG:  In terms of our sentencing

16  recommendations, the line attorneys who write the sentencing

17  memoranda are, you know, given access to the spreadsheet that --

18          THE COURT:  I know.

19          MR. KONIG:  -- the Court has but also a spreadsheet

20  with all the aggravators.

21      And we propose it to a sentencing team of a very few people

22  who have oversight over all of the cases.  And then they review

23  it and make their recommendations.  And then it goes to a

24  management team.

25          THE COURT:  I get it.  The larger point I want to make

1    is, simply because the government can prove a given charge in a

2    given case -- for example, in this case, technically you could

3    have proven perhaps the assault if you convinced me that this

4    was intentional conduct coming in the door, and thoughtful

5    discretion was used not to charge that here.

6        And I think it's very difficult for that sort of decision

7    to be reached in cases where the evidence is stronger.  So

8    simply because the government can charge something greater and

9    feels confident that it can prove it, it's doing it, and that's

10   creating some real distortions.

11       Does that make sense?

12           MR. KONIG:  I think so, Your Honor.

13       I will just finish by saying the recommended sentence in

14   this case was recommended --

15           THE COURT:  And I understand your recommendation.  I'm

16   not the only one not following your recommendations to a T.  But

17   I have no concerns in this particular case about the

18   recommendation.  I don't mean for you to have that impression.

19   It's just this is a case that illustrates all the different

20   decision points that go into when you're looking at five or six

21   very different charges that go to different guidelines that have

22   substantial consequences.

23       And I think the government's position here is a fair one.

24   I'm not likely to follow it, but it does make sense to me.

25       All right?

1          MR. KONIG:  Thank you, Your Honor.

2          THE COURT:  And I don't mean to micromanage the

3    department.  If someone like you could read the facts of every

4    one of these things and make a decision, that would be a great

5    job for a detail-oriented tax guy.

6          MR. KONIG:  Thank you, Your Honor.

7      If you don't have any further questions for --

8          THE COURT:  No, I don't.

9          MR. KONIG:  -- I will close, then.  Thank you.

10          THE COURT:  Ms. Spearman, you've heard the

11    conversation about these cases.

12      Just to be fully transparent, I'm viewing myself somewhere

13    in the four to eight months range.  You may convince me that it

14    should be lower, but let me just say, I'm a little skeptical of

15    the claim that Mr. Shough puts himself in the front.  Maybe it's

16    well-intentioned to go in and warn the police.

17          MS. SPEARMAN:  I can address that, Your Honor.

18          THE COURT:  Okay.  But I'm just -- it's me finding by

19    a preponderance what his intention was at that moment.  Even if

20    he had no intention ahead of time, I think it was -- it's

21    difficult for the Court to reach the conclusion that he was

22    effectively like carried in there.

23          MS. SPEARMAN:  Yes, Your Honor.  And would you like me

24    to address that point first?

25          THE COURT:  That's the most critical one, in my view.

1        MS. SPEARMAN:  Your Honor, I don't think at any point

2   we have contested Mr. Shough did not at any point intend to go

3   in the building.  He's not contesting that he did not intend to

4   be there.

5        I think our point in contesting was that he did not intend

6   to be the first person through the door.

7        THE COURT:  How can you say that when he's right at

8   the front of the mob and he's been out there for a while and

9   he's been encouraging people and he's been saying "cops need to

10  stand down and go home; millions are coming in"?  How do you say

11  that he accidentally ended up near the front?

12       MS. SPEARMAN:  Yes, ma'am.  I would say that he was --

13  I will say, I do believe that he was shuffled as a part of his

14  way to the front.  I believe that he intended to be there.  I

15  believe that he intended to go into the Capitol building, and

16  we've talked about that.

17       However, I do think that he was a part of a crowd, and as a

18  crowd starts shifting in and shifting in, people start shuffling

19  forward and shuffling forward and pushing each other and bumping

20  each other.  I'm sure that we've all -- I'm so sorry.

21       I'm sure that we've all done some Black Friday shopping or

22  seen some -- I'm not trying to compare the two things, but

23  that's my personal experience of being shuffled in a crowd a

24  little bit, or at a concert where we see people shuffled to the

25  front of a crowd or shuffled around.  It's very easy to get lost

1    in a crowd and to lose your --

2         THE COURT:  To be clear, Mr. Shough had ample

3    opportunity to give a fist to the officers who were standing in

4    front of him.  He could have assaulted them quite easily, and he

5    did not do that.

6         MS. SPEARMAN:  No, ma'am.  And Mr. Shough has the

7    utmost respect for the authorities.  He genuinely believed that

8    he was at the Capitol building under orders from the

9    then-president.  I know that is not necessarily a mitigating

10   factor, and that's not what we're here to debate today.  Today

11   is about issuing Mr. Shough's sentence.

12        And to go through some of the points made by Your Honor and

13   by the government, when Mr. Shough was at the front of the line,

14   he did go in.  He did speak with some of the officers.  He said,

15   "I told the cops to stand down because we love them."  He was

16   trying to make sure they didn't get hurt.  He was asking them to

17   call their supervisors because he believes the supervisors would

18   tell the officers who were there to stand down.

19        He was not trying to tell them --

20        THE COURT:  To be clear, I don't think he was

21   intentionally trying to hurt them.  That doesn't mean that he

22   didn't knowingly, intentionally enter in the building in a mob

23   that he was a part of.

24        MS. SPEARMAN:  Again, Your Honor, we're not contesting

25   that he was not intentionally entering.  Our only point has

1    been --

2             THE COURT:  He was not the instigator.  He would have

3    acted differently once he got in.  But it was clear --

4             MS. SPEARMAN:  We can see for minutes and minutes,

5    he's just walking down the hallway looking around.  Again, I've

6    read in the government's sentencing memorandum and other orders

7    and sentences issued by courts and opinions, that somebody's

8    lack of engagement in this offense or -- for want of a better

9    phrase, is not a mitigating factor because people who were more

10   atrocious with their behavior inside the Capitol obviously are

11   receiving higher guideline ranges.

12        However, Your Honor has made a very good point in saying

13   that while his -- within a guideline range, within a charge,

14   there are differences, and the guidelines are a great system as

15   a starting point.

16            THE COURT:  No, I know.  And you've heard me.  I'm

17   not --

18            MS. SPEARMAN:  So I would just like to address some of

19   the government's points that they made.

20        With regard to the clothing, it is motorcycle gear, but

21   Mr. Shough did drive a car out here with his bicycle and was

22   intending on riding his bicycle around the District of Columbia.

23   It's a relatively large city --

24            THE DEFENDANT:  I rode my bicycle to the event.

25            MS. SPEARMAN:  Yes.  You drove your car to D.C.

1          THE DEFENDANT:  It was in the parking garage.

2          THE COURT:  Mr. Shough, you will get a chance to

3    address the Court if you wish.

4          MS. SPEARMAN:  So he was riding his bicycle to the

5    event and around.  That is the reason for the gloves and the

6    helmet.  It's the bike gear that he owns.

7          THE COURT:  Brass knuckle gloves he bikes in?

8          THE DEFENDANT:  I don't --

9          THE COURT:  Mr. Shough, stop, stop.  I will give your

10   counsel a moment to consult with you before she sits down.

11         THE DEFENDANT:  Okay, Your Honor.  I'm sorry.  I

12   apologize.

13         MS. SPEARMAN:  I believe that they are referenced as

14   hard-knuckled gloves.  My sister-in-law rides motorcycles, so I

15   consulted her about this, and she said that hand injuries are

16   really common in motorcycle accidents, and like rain and

17   everything can really hurt your knuckles while you're riding

18   motorcycles.  So motorcycle gloves are often reinforced on the

19   knuckle line.

20       So I don't think that the government called them

21   brass-knuckled gloves.

22         THE COURT:  That may be my term.  Sorry.

23         MS. SPEARMAN:  That's okay.  I wanted to, like I said,

24   clarify the clothing argument.

25       And then with regards to the gaiter, I do believe that the

1    guidance in January of 2021 was that face coverings should be

2    worn in groups of large people --

3          THE COURT:  Perhaps he didn't want to be surveilled

4    when he goes in the Capitol.

5          MS. SPEARMAN:  I would just like to acknowledge that

6    it was the guidance at the time to have face coverings on inside

7    of buildings and around crowds.

8          The government repeatedly uses the term that Mr. Shough was

9    bragging in there, in its sentencing memorandum, that he told

10   the officers to go home.

11         I would like to say that he was not, again, bragging.  He

12   was telling them that they needed to get the situation under

13   control.  He was telling them to call for backup.  He was not

14   telling them -- he wasn't using derogatory language.  He wasn't

15   telling them they were doing a bad job.  He wasn't --

16         THE COURT:  I listened to the video he took of himself

17   outside.  He's not using derogatory language, but he's

18   clearly -- one, he's encouraging people to come.  He's helping

19   people up.  He's celebrating up there.  And he's saying, "These

20   officers need to stand down; millions are coming in."

21         Like, this is not --

22         MS. SPEARMAN:  I don't think that any of it was

23   intending to be threatening to the officers' safety, and I don't

24   think that you believe that either.  But I think that the

25   millions --

1          THE COURT:  It's degrees; it's degrees.

2          MS. SPEARMAN:  Absolutely.

3          THE COURT:  There are things that are a natural and

4     probable consequence reasonably foreseeable to what he's doing

5     that he should be more aware of.  I'm just saying, I don't think

6     he went in there with the intent I'm going to assault officers.

7     But I do think he was a part of a violent scrum that he was not

8     separating himself from.  Indeed, he was putting himself towards

9     the front.  He was surrounded by all these people who were

10    acting crazy.

11         MS. SPEARMAN:  You asked before, can it be both, can

12    it be both that he intended to go in there, that he intended to

13    be a part of this crowd, and also that he was being shuffled to

14    the front of it.  I believe that's what you're referencing, can

15    it be both, that he didn't intend to push his way forward, but

16    he did intend to be on the early side of things.

17         THE COURT:  Almost deliberately indifferent?  Is that

18    what he's doing, where he's standing around this super jazzed-up

19    crowd who is trying to --

20         MS. SPEARMAN:  Caught up in the moment is the phrase

21    that I would use.  Again, mob mentality, I've read, is not a

22    mitigating factor in any of this.  But I think it is very easy

23    to get caught up in a moment and to still have your convictions

24    of not intending to engage in violence of any kind but also --

25         THE COURT:  Sure.  You could be caught up in the

1    moment and maybe not be thinking through everything so clearly,

2    but that doesn't mean you're not responsible for your actions

3    when you're caught up in the moment.  You get angry and lose it.

4        I'm not saying that's what he did.  But that doesn't make

5    it an unintentional act.

6        MS. SPEARMAN:  No, it doesn't.  My college team won

7    our homecoming match, and the immediate thing everybody did was

8    started swarming the field, climbing over the fences, going onto

9    the football field, something that was certainly not allowed.  I

10   knew it wasn't allowed, and I knew I wanted to apply for law

11   school.  It seemed really exciting and fun, and so, of course, I

12   participated in that.  So I --

13        THE COURT:  Have to take the Fifth.

14        MS. SPEARMAN:  So I say that all to say that I think

15   your read of that exact description is perfect.

16        I would also like to point out that apart from what we

17   mentioned in our sentencing memorandum, Mr. Shough -- and I know

18   you read this in the letters -- he's not the type of person who

19   normally attends rallies and riots and is overly politically

20   involved.  He is the type of person who, when the pandemic hit,

21   he moved in with his aunt and uncle to make sure that they

22   didn't have to go out and go grocery shopping and risk any

23   further illness to his uncle who is dying of --

24        THE COURT:  It's very out of character, extremely.

25   But he's not the only January 6 defendant, sadly, who is in this

1    boat.

2              MS. SPEARMAN:  I would estimate that most of them are.

3              THE COURT:  It confounds me how many good men and

4    women who live productive, law-abiding lives got wrapped up in

5    this and, you know, put themselves and those around them at

6    great risk.

7              MS. SPEARMAN:  Absolutely.

8         And then with regards to the government's question about --

9    I'm sorry, I think it was Probation's note about early remorse,

10   Mr. Shough did engage legal counsel as soon as he was aware that

11   there was an investigation against him, and we began discussing

12   with the government quite early on.  I think as early as a year

13   ago, we had come to general proposed plea terms.  We received a

14   plea offer dated May of 2022 which Mr. Shough very quickly

15   indicated that he would like to accept.  And in August, we were

16   doing the plea, the plea hearing over VTC, I believe it was with

17   you, actually.

18        So I'm not sure of their concern about early acceptance and

19   remorse.  I've read Mr. Shough's letter.  Typically, I am the

20   one who writes acceptance statements for my defendants, but I

21   certainly did not need to do that in this case.

22        Mr. Shough is the type of person who not just learned from

23   his own actions and how it affected his family, but has gone

24   forward and done further research into how this event occurred

25   and how it really affected the country as a whole and people's

```
1   safety as a whole, and has taken the time to do research and

2   work to make sure something like this doesn't happen again.

3        And I think that that is also something that is unique in

4   cases like this where many people just said, God, that was a

5   really dumb mistake, and go back to work on Monday.

6        And that's not what Mr. Shough did.  He tried taking steps

7   to remedy his conduct and to prevent anything like that from

8   happening in the future.  So certainly --

9            THE COURT:  That's commendable.

10       Let me ask you one question that I found a little puzzling.

11  Paragraph 56 of the presentence report, Mr. Shough explained to

12  Probation that he moved closer to where the U.S. Marshals were

13  located because he knew there would be a warrant issued for his

14  arrest.

15       So he literally moved, and the Court should draw the

16  inference that he moved, not to avoid being arrested, but rather

17  to facilitate his arrest?  Did he inform the marshals where he

18  is?

19       That's an odd reason to move, that you know there will be a

20  warrant issued for your arrest, and therefore, you move closer

21  to them.

22           MS. SPEARMAN:  Your Honor, I think I have an answer to

23  that, but can I confer with Mr. Shough real quick?

24           THE COURT:  Sure.  And while they're doing that -- no,

25  go ahead.
```

1          (Defense counsel and defendant conferred.)

2               THE COURT:  One correction I want to make.  I said his

3     own video.  That was a rioter near him who took the video of

4     him.

5               MS. SPEARMAN:  Thank you.  Yes.  We thought that you

6     were referencing the interview video in the government's

7     exhibits.

8          Your Honor, once he learned of the charges against him and

9     engaged his attorneys to begin negotiating the self-surrender

10    process and everything associated with that, Mr. Shough was at

11    the time living out in west Texas where there was no cell phone

12    service.  And he was worried that he would miss a call from a

13    lawyer, miss a court date.  I grew up in Texas.  It is just

14    huge.  Nothing is driving distance.  So he moved closer to

15    Austin, moved closer to the courthouse.

16         And at the time, I think he was unsure if his court

17    appearances, marshals, and everything would be happening in

18    Austin or D.C., so he was trying to be responsible and be sure

19    that he could be on-site in case he needs --

20              THE COURT:  That makes sense.

21         Let me ask -- you can stay there, but Mr. Konig, just from

22    your seat, this point about the gloves and the gear, I used the

23    term "brass knuckles."  That sounds incorrect.

24         You agree with the defense that these could be biking

25    gloves?

1          MR. KONIG:  Yeah, I believe they're referred to as

2    hard-knuckle gloves.  I will note, he was not riding a

3    motorcycle on January 6, 2021.

4          THE COURT:  He also had on a vest that had, he says, a

5    Kmart cutting board.

6      That's not riding gear either, is it, Ms. Spearman?

7          MS. SPEARMAN:  No, Your Honor, I do not believe that

8    the vest was used for riding.  I believe that protestors were

9    advised by -- can I ask him a question?

10         THE COURT:  It sounds like a convenient explanation

11   for all of this gear that may not really add up.

12         MS. SPEARMAN:  Your Honor, I believe that some of the

13   gear, I think the protestors were advised by the people sending

14   out the messages to be prepared in case of violence.

15     I know from personal experience, with everything that

16   happened in the summer of 2020 that we saw, many peaceful

17   protests and marches that started --

18         THE COURT:  So which is it?  Is it that, or is that he

19   didn't want to hurt himself if he rode around D.C. riding his

20   bike?

21         MS. SPEARMAN:  I think the vest was a part of the

22   outfit specifically for the event.  I believe that the leather

23   bike and gloves -- he lives in Austin, Texas.  It does not get

24   cold there.  He does not need a hard jacket and gloves.  That's

25   the gear that he had.  It was cold.  He was riding his bike

1    through D.C.  So he had the helmet and the jacket and the gloves

2    for that, and I believe that the vest was a part of the

3    necessary attire for the event.

4              THE COURT:  All right.  Mr. Konig?

5              MR. KONIG:  I will just note, it's our position that

6    these items were not for use to protect him while riding his

7    bike.  He did not ride a motorcycle that day.

8        I should also note that in Exhibit 2 where he's, for lack

9    of a better term, interviewed by the individual, you can see at

10   about 36 seconds in what appears to be a small knife on the

11   exterior of his belt.

12       Now, again, that is also consistent with his claim that he

13   was trying to defend himself against feared attacks from

14   nefarious individuals, is similarly consistent with him, you

15   know, gearing up for battle.

16             THE COURT:  Right, and not just being safe riding the

17   bike.

18             MS. SPEARMAN:  And is also consistent with people who

19   live in west Texas.

20             THE COURT:  Fair enough.  But typically, you don't

21   take a knife in a government building, even if you're from west

22   Texas.

23             MS. SPEARMAN:  I'm not arguing that part.

24             THE COURT:  Just like you wouldn't take that knife on

25   an airplane.

1        All right.  Anything else you would like to say,

2   Ms. Spearman?

3            MS. SPEARMAN:  No, but I believe that Mr. Shough would

4   like to make a brief statement to the Court.

5            THE COURT:  All right.  Mr. Shough, this is your

6   opportunity to address the Court if you would like to make a

7   statement before I impose sentence.

8            THE DEFENDANT:  May I approach, Your Honor?

9            THE COURT:  Yes, you may.

10           THE DEFENDANT:  I just want to apologize for

11  interrupting earlier and to --

12           THE COURT:  Speak into the microphone.

13           THE DEFENDANT:  I just want to apologize for

14  interrupting earlier and apologize to my attorney Katryna as

15  well for that.

16       Obviously, this is very emotional for me, and this is my

17  life.  So I'm very interested in what's said.

18           THE COURT:  Understood, completely.

19           THE DEFENDANT:  I am definitely remorseful, but it's

20  about truth as well.  So I could take the easy way out and lie

21  about certain things, and maybe you might view it in a better

22  light, or I could say what actually happened in my view.

23       So if you will permit me, I would like to make somewhat of

24  a statement here.

25           THE COURT:  Sure.

1          THE DEFENDANT:  Ten, 15 minutes.

2          THE COURT:  10 or 15 minutes, okay.

3          THE DEFENDANT:  I will try to hurry up, Your Honor.

4      So why did I attend January 6?  I attended because of

5  President Trump.  He said that there was -- he won the election,

6  there is voter fraud all over the country, it was a rigged

7  election, he won the state of Pennsylvania, and we're not going

8  to have -- stand for the election being stolen.

9      Furthermore, he said that Peter Navarro had a report,

10  36-page report, and he was going to discuss that.  So I was

11  going to the rally to hear evidence of a supposed stolen

12  election, which I later learned there's no evidence of that that

13  I've come across.  He said, "Massive amounts of evidence will be

14  presented on the 6th.  We won big."

15      So when I went there -- I brought a rental car, because I

16  thought there was going to be five million people, which it

17  wasn't even close to five million people.  And I parked in a

18  garage a few miles away from town.

19      And indeed, I did bring the helmet and the gloves for two

20  purposes.  The first purpose was because I thought I was going

21  to be in busy traffic.  I've been down on my motorcycle before.

22  25 miles per hour, maybe even less, it hurts.  You will cut up

23  your hands.  You will bruise yourself.

24      Even on a bicycle, if I get hit by a car or I go down in

25  traffic, that is very useful gear for me to have for personal

1    protection on a bicycle.

2         And I have a picture of myself attending the rally with the

3    bicycle and going there with the bicycle.

4         Now, the vest, people wear vests on motorcycles.  That's

5    not why I brought the vest.  I have a tweet here from Donald

6    Trump.  He said, "Antifa scum ran for the hills today when they

7    tried attacking people at the Trump rally because these people

8    aggressively fought back.  Antifa waited until tonight when

9    99 percent were gone to attack innocent MAGA people."

10        So why did I wear the vest?  Because Trump and others were

11   talking about ambushes, you know.  Who knows if that is actually

12   true.  I don't even know if that actually happened.  But I was

13   concerned about my personal safety, not gearing up for some

14   tactical assault on the Capitol.

15        I wanted to protect myself in multiple ways.  So it was

16   dual use.  The vest was single use.  I was worried about

17   somebody stabbing me or something, as irrational as that might

18   be.  I was listening to what the President of the United States

19   was telling us.

20        The helmet and the gloves were dual purpose.  I don't see

21   how they really help me out if somebody attacked me or

22   something.  Maybe if they came at me with a knife.  But the

23   helmet was for the bicycle and, again, if somebody tried to

24   attack me.

25        I did not have a knife with me.  This is the first time

1    I've even heard about this.  This is just brought up now.  Where

2    was this before?

3             THE COURT:  Well, there's a photograph, apparently.

4             THE DEFENDANT:  Well, there is no knife.  I swear on

5    my mother's life that there is no knife, and if there was a

6    knife, let's see it.

7        In terms of my behavior there, it was wrong.  I can't

8    really disagree with anything that was said other than trying to

9    tell me what was going on in my head at the event.

10       So what was going on in my head?  Well, Trump said, "We're

11   going to the Capitol.  We're going down Pennsylvania Avenue."

12   And we've got a few hundred thousand people there.  It looked

13   like a few football stadiums where he was speaking.

14       So we go down to the Capitol, and I follow the crowd.  And

15   I'm like well, where would all these people go?  Where would

16   they end up at?  The lawn looked like a perfect place.

17       I didn't clear any barriers or anything.

18             THE COURT:  The what?

19             THE DEFENDANT:  The Capitol lawn, Your Honor.  It

20   looked like a place that could actually accommodate the large

21   crowd.

22             THE COURT:  You didn't see the barriers and the signs

23   and the signs that had been -- the barriers that had been

24   knocked down and the plastic fencing that was all over that

25   area?

1          THE DEFENDANT:  I saw plastic fencing.  But what it

2     looked like to me was, it was like they're redoing the lawn or

3     something.

4          THE COURT:  Seriously?  It didn't occur to you that it

5     might have been taken down by that large crowd that was very

6     unruly?

7          THE DEFENDANT:  It was all moved like off to the side

8     when I came back out of the Capitol.

9          THE COURT:  No, I'm talking about when you saw it on

10    the ground.  You admit that you saw it on the ground.  But your

11    initial thought is law enforcement's just taking this down and

12    setting it up, not that it --

13         THE DEFENDANT:  It was already set in its place.

14    Yeah, maybe I should have realized that hey, this was actually

15    encircling the entire area where I was approaching.  But it was

16    like completely moved off to the side.

17    So I don't deny that it was wrong being there on the

18    grounds.  I know that was -- I was not supposed to be there --

19         THE COURT:  But I thought you just told me that you

20    thought it was a perfectly reasonable place to be.

21         THE DEFENDANT:  Yes.  And I learned later I wasn't

22    supposed to be there.

23         THE COURT:  But you just told me, I thought, a second

24    ago that you don't deny you shouldn't have been there.

25    You mean only today?  At the time, you really didn't know

1    at the time you weren't supposed to be on the restricted

2    grounds?

3              THE DEFENDANT:  There was no signs that I came across,

4    and there was no barriers that I came across indicating that we

5    weren't supposed to be in the lawn.

6              THE COURT:  Did you think you were supposed to be in

7    the Capitol?

8              THE DEFENDANT:  In the Capitol?  No, Your Honor.

9              THE COURT:  But you admit you willingly went in and

10   intended to go in the Capitol; correct?

11             THE DEFENDANT:  Honestly, I don't know.  I do not

12   know.

13             THE COURT:  I don't understand.  You've had over,

14   what, two years to think about this.  You have no idea why you

15   were going in the Capitol?

16             THE DEFENDANT:  I had no premeditated plans to go in

17   the Capitol.

18             THE COURT:  What do you mean by "premeditated"?

19             THE DEFENDANT:  I did not sit anywhere and think about

20   I'm going to go in the Capitol before this event happened.  I

21   remember -- if I recall, I remember -- state of mind, when I was

22   talking to the FBI and they asked me well, what about this

23   interview that you did after you left the building.  And I tried

24   to explain to them the state of mind that I was in and like what

25   was happening.  I was shaking and everything.  They're like,

1    well, that's adrenalin.

2             THE COURT:  Were you under the influence of anything?

3             THE DEFENDANT:  No, Your Honor.  I do not do drugs,

4    rarely drink.

5             THE COURT:  But you were shaking because?

6             THE DEFENDANT:  Because the FBI agents -- Mark Winters

7    told me that it was adrenalin, and we were exposed to chemical

8    irritants.  I'm not saying that those irritants shouldn't have

9    been deployed against us.  Those are valid crowd control

10   measures that the police did.  But according to Physicians for

11   Human Health, what can happen is, if you get hit with that,

12   which I did, fear, anxiety, and panic can happen, and it may

13   even cause hypoxia, which causes confusion.

14       So can I honestly say that I had a clear mental state?  I

15   did not.  I don't even know what I was doing there.  I

16   remember --

17            THE COURT:  This is the first I've heard of any kind

18   of mental --

19            THE DEFENDANT:  That's the statement that I gave to

20   the FBI.  That is what I originally delivered in October to

21   them.

22            THE COURT:  Yes?

23            MS. SPEARMAN:  Your Honor, I do believe that when we

24   discussed -- during the plea hearing, I think that Your Honor

25   inquired in a similar line of questioning to ensure that the

1  factual basis was correct.  And I think we discussed that

2  Mr. Shough was in the Capitol building for about 15 minutes.

3  And I believe, even during the change of plea hearing,

4  Mr. Shough recalled entering, and he recalled leaving, but had

5  kind of a blank space of how long he was actually in there.

6      And so I think to say that -- I say that to say that there

7  was a lot of adrenalin happening, there was a lot going on, and

8  so not remembering every second of it is what he has maintained.

9      It is not the first time he has brought this up with

10 Probation or with the Court.

11      THE DEFENDANT:  It was stupid and wrong, what I did.

12 I do not disagree with that.  And I do regret it.  I shouldn't

13 even have been there.  I put myself in this situation of being

14 by those doors.

15      What was my mental state?  I had a medical kit on me.  I

16 thought maybe I'd apply first aid.  How realistic was that?  You

17 know, maybe not even realistic.

18      When the FBI asked me, you know, how long were you in

19 there, I recalled a couple minutes.  It was 15 minutes.  It was

20 longer than a couple minutes.  But being inside, it seemed like

21 that.  Maybe it was the adrenalin.  Maybe it was the chemical

22 irritants.  I perceived that I was in that building for a couple

23 minutes.

24      THE COURT:  Do you have an issue with adrenalin in

25 other kind of exciting circumstances in your life?

1          THE DEFENDANT:  I'm an IT worker.  I sit at a desk

2     most of the day.  That's my life.  It's pretty uneventful.  I've

3     never been in a situation like that before.

4          That's not to excuse my behavior.  Again, I'm just

5     interested in telling the truth from what I actually went

6     through.

7          So, on the lawn, I did confront the police officers.  I

8     thought we were waiting for the president to arrive, as

9     ridiculous as that it is.  Apparently, he was supposed to be

10    somewhere else, the rally.  We thought the president was coming

11    to speak.  He never showed up to speak.  He told us to go there,

12    and he never showed up.

13         In this state of confused mind, I thought that -- without

14    any orders from the police, there was no dispersal order or

15    anything, I couldn't really piece together what was happening.

16         And yeah, I told them, You need to go home, because in my

17    mental state, it's like, we're waiting for the president to have

18    a rally, the President of the United States.  You know,

19    commander-in-chief, the top of the executive, we're waiting for

20    him to come speak, maybe tell us more about the stolen election,

21    which there's no evidence for.

22         So I told them to go home.  The officer on the lawn said

23    we're not supposed to talk to you.  And then yeah, I helped

24    people over, and I went closer to the Capitol, and that was

25    wrong.  I shouldn't even have been in front of those doors to

1    put myself in that situation.

2         But I did get pushed inside.  At that moment when it

3    happened, there were people behind me that said "1, 2, 3, go,"

4    and I felt a push from behind me, and my entire body just locked

5    up.  I couldn't do anything about it.

6         THE COURT:  So what did you think was going to happen

7    standing at the front of the mob?  Did you think that the police

8    were just going to open the doors and you were going to be one

9    of the first ones in?  What did you expect to happen, putting

10   yourself at the front of an angry, violent mob?

11        THE DEFENDANT:  Well, looking back on it now, I should

12   have realized that that was the wrong situation to even --

13        THE COURT:  It didn't occur to you at the time?  You

14   just thought the doors would open?

15        THE DEFENDANT:  What was going through my mind at that

16   time, it was like fragmented cognition of what was going on.

17   They weren't rational thoughts.  The only time that like a

18   rational thought came across me was when I was inside the

19   Capitol.  And I told the police officer the same thing, like you

20   need to go home, which is obviously stupid.

21        You know what?  The Capitol Police officer that I talked

22   to, I thought he was the one that was in charge because he had a

23   nonhard helmet on.  He said, "Do you know what would happen if

24   we went home?"  And at that moment, that's when it started

25   clicking for me, oh, my God, you know, you are in a very bad

1    situation, and these police officers are doing a job.

2         And then the next thing I said to him was, "Well, you need

3    to get ahold of Trump," which is -- nobody is going to get ahold

4    of Trump.  He told me, "You have as good a chance of getting

5    ahold of Trump."  In my confused state of mind, that was my way

6    of trying to help things, even if it didn't help.

7         And then I asked him, "Can you get in contact with your

8    superior?"  And this is paraphrasing.  I don't remember the

9    exact words.  But that was the intent.  That was the content.

10        And I thought I was only in there for two minutes.  It was

11   15 minutes, according to the FBI.  I remember after saying that

12   to him being shown a way out, which I perceived to be to my

13   right.

14        I did not damage any property there.  I did not seek any

15   confrontation with the officers walking the way out.

16        Mr. Konig said that I disappeared.  I just remember walking

17   out of that building, and that's when I ended up on the stairs

18   outside and had that adrenalin drop apparently, according to

19   what the FBI thought.

20        But 22 minutes before I was pushed inside, there was a

21   crowd in there that y'all talked about.  This video shows the

22   video of the person organizing, pushing people in, and he's

23   actually on audio saying here we go, here's the next rush,

24   there's a push inside.

25        I'm not saying what I did was right.  I shouldn't have been

1   there.  But again, I'm just interested in the truth, telling

2   what happened.

3       When I was in that pose like this, this was me trying to

4   prevent getting pushed forward.  So I didn't progress forward

5   and start pushing police officers.  Once I got inside, I tried

6   to get out of the way.  That stance was to get low and try to

7   prevent from being toppled over.  And when that was happening,

8   as y'all have talked about, there were people leaving the

9   building as I was being pushed in.

10       So I will try to finish this up really quick.  I just want

11  the Court to know that I am deeply sorry for my actions on

12  January 6.  Within a month of the event -- I didn't double down.

13  The country's divided.  There's people that say I'm a domestic

14  terrorist, and there's people who would give me a high five.  I

15  didn't engage in the high fives.  I didn't go on Twitter or, you

16  know, try to get more radicalized, so to speak.  I wanted to

17  understand what happened.  And it took me about a week to

18  actually get in the state of mind where I could try to figure

19  out what happened that day, and I started doing research.

20       I've actually switched my party affiliation, not because I

21  fully support Biden, but I think that he is the rightful

22  President of the United States, and he deserves everyone's

23  support right now in these trying times, and I've included

24  receipts at the end of this showing that I'm a Democratic Party

25  donor.

1    So when I found out that this was probably going to be a

2    thing, that I was probably going to get prosecuted, I heard

3    reports that the FBI was raiding people and stuff like that.  So

4    I contacted a lawyer, and I removed myself from the situation.

5    This may have not been logical, but I literally moved to the

6    middle of the desert so if the FBI decided to raid me they

7    wouldn't inadvertently hurt people in the household that I was

8    living with.

9    So I literally lived homeless for a year in the desert, in

10   the west Texas desert, drive into town like every two days for

11   cell phone contact with my lawyer.  Checked in --

12        THE COURT:  Did anyone know where you are?

13        THE DEFENDANT:  Yes.  I went to an area that was --

14   well, first of all, I told my lawyer.  Second of all, I went to

15   an area that was a top confidential informant relocation area

16   for the FBI.  It's well known.  It's also -- there's cameras

17   everywhere.

18   In terms of cameras, I actually did consulting work for

19   government on surveillance projects.  I know the inner workings

20   of cameras.  When I was there that day, you know, I pulled that

21   up because, you know, I'm going in a government building, I need

22   to wear a mask.  It sounds ridiculous, but I've worked on

23   surveillance projects.  I've built surveillance for courts.

24   I've worked on a project for the FBI before.  I knew I was being

25   picked up by facial.  So even if I went inside, that's kind of

1    beside the point.

2         Anyways, I was out in the desert for a year, almost for a

3    year.  And what did I do every single day?  I wanted to

4    understand the causes of how I got to that event on January 6,

5    what motivated me psychologically.  And I ended up doing a

6    multi-year project.  When I delivered it to the FBI, it was a

7    little over a year, thousands of hours of research, 180 pages,

8    tracking the media organizations that were telling lies and

9    putting people there.

10        You're trying to understand, how could something like this

11   happen to good people.  This may sound outlandish, but I've

12   delivered evidence to the FBI backing up my claim that bolsters

13   the August 2020 State Department GEC report on Russian

14   disinformation.  What I found was that there was actually

15   Russian Foreign Intelligence Service working with the U.S. media

16   to put people there.  And the evidence is -- you can't deny it.

17   It was all delivered to the FBI.

18        Subsequently, what I've done with that research is I've put

19   it anonymously, trying to warn people --

20             THE COURT:  You what?

21             THE DEFENDANT:  I've put it out anonymously trying to

22   warn people about what I found, because I delivered it to the

23   FBI.  I didn't know if they would actually understand what I was

24   trying to say, even though I'm using State Department reports to

25   use as the basis for my research and expand upon it.

1       So what I identified with that research was -- well, I

2   delivered it to the State Department, the Atlantic Council

3   Digital Forensics Lab, Miburo, which is now a part of Microsoft

4   Digital Threat Analysis, and I published it anonymously, and

5   2,000 people have viewed the research.

6       It directly connects Russian foreign intelligence to parts

7   of the MAGA movement.  And I have articles showing that Russian

8   foreign intelligence, per the State Department August 2020

9   report, writers, task writers were publishing articles on U.S.

10  media calling for things such as a second American revolution.

11      In other words, Your Honor, what this is, this is

12  psychological warfare by foreign government working with U.S.

13  media to put people there.  And that's what I realized.

14          THE COURT:  You're saying that the media knowingly

15  conspired with Russian forces or the media was manipulated?

16          THE DEFENDANT:  Both.  Specific example, let's take

17  Alex Jones.

18          THE COURT:  Take what?

19          THE DEFENDANT:  Alex Jones.  If anyone has heard of

20  the QAnon phenomenon?  I'm just asking if anybody's heard of

21  that.

22      Alex Jones on record said -- and this is a guy that pushed

23  the psychological operation, as I call it -- most of the people

24  that entered the Capitol were somehow influenced by this QAnon

25  mind-set.  I asked myself, was I influenced by this.  I didn't

1    follow QAnon, but these were people that were secretly pushing

2    this.  And then -- as a covert, you know, operation, so to

3    speak, and these same people that were pushing this were putting

4    out reports saying that the election was stolen, that people

5    need to show up there, without referencing QAnon.

6         So without going into too much detail, Your Honor, and I

7    would like to read off my apology to the American people here in

8    a minute --

9              THE COURT:  Is this the same one that's in the PSR?

10              MS. SPEARMAN:  Yes, ma'am.

11              THE COURT:  Okay.  I've reviewed that.

12              THE DEFENDANT:  I will try to summarize here the last

13    two minutes.

14         Ultimately, spending a year in the desert, turning myself

15    in to the U.S. Marshals, I had enough time to, you know, produce

16    substantial evidence about these claims to understand what

17    motivated me psychologically to go there.  My intent was to --

18    because all the people that did this, they're still free.

19    They're still operating.  My intent was to prevent something

20    like this from happening again, and it very well can.

21         There's a lot of controversy around Lieutenant Colonel

22    Vindman, who I think gave testimony to the Senate.  He said that

23    he saw the events of January 6 being connected as to the events

24    in Ukraine.  And indeed, that jibes with my research showing

25    Russian intelligence working with certain U.S. media outlets.

1          So I submitted my research to Atlantic Council's Digital

2    Forensics Lab, the U.S. State Department, and I've identified --

3    I've done original digital forensics research building upon the

4    State Department August 2020 GEC report showing specific

5    examples of Russian foreign intelligence being published by U.S.

6    media.

7          In one single instance, 500,000 Americans were exposed to

8    Russian foreign intelligence articles, in other words

9    psychological warfare.  I identified specific people involved.

10   The U.S. Treasury Department has put sanctions on these

11   foreigners.

12          THE COURT:  So Mr. Shough, I'm familiar generally with

13   this kind of information.  Even so, let's assume for a moment

14   that all of what you've investigated is true.  That does not

15   absolve you and others from going in the Capitol.  And what

16   disturbs me most as I sit here today and listen to all the good

17   work you've done in terms of reflecting on how you got there and

18   how misguided your views were and wanting to turn things around

19   in your life, that today as you stand here in front of me, you

20   still can't answer basic questions about that day.

21          You have a lot of I don't knows to really critical

22   questions that would allow the Court to determine your intent

23   that day.  And it's basically, I don't know, I was affected by

24   pepper spray, and I had a lot of adrenalin.

25          But that's -- I don't know that that's a defense, if you

1    will.

2              THE DEFENDANT:  That's fine, Your Honor.  I just want

3    that on the record, that there was no plan beforehand other than

4    to go see Trump speak.  He said that we need to go to the

5    Capitol.  I went to the Capitol.

6              THE COURT:  And I believe that -- I think it's quite

7    likely that you did not necessarily plan when you were at the

8    Ellipse to go in the Capitol.  That's a possibility.

9         But there was a moment that you -- I find it hard to accept

10   that you will not admit that at some point you made the decision

11   to go in, however close to the time you entered, but there was

12   at some point, it seems to the Court, by a preponderance of the

13   evidence, that at some point you were not involuntarily acting

14   and just sort of carried by the mob into the Capitol, that there

15   was a degree of conscious choice.

16        It might not have been well thought out on your part.  It

17   might have been, as your attorney suggests, that you were caught

18   up in the moment and did a crazy thing.  But you did have

19   intent.  Nobody picked you up and pushed you through that door.

20        Is that what you want me to believe?

21             THE DEFENDANT:  I definitely went up the stairs on my

22   own volition.  I put myself in front of the doors or close to

23   the doors on my own.

24             THE COURT:  More than that, knowing that they're

25   trying to bust through these doors and I'm right here at the

1    front.

2         THE DEFENDANT:  All I can say is at the moment that

3    those people said "1, 2, 3, go" and I was pushed in, every

4    single fiber of my body tightened up, and I wasn't trying to go

5    through there.

6         THE COURT:  You didn't turn around and go out.  You

7    stayed in there for a while.  Someone else in that group did.

8         THE DEFENDANT:  My perception of what was going on,

9    did I even perceive that there was a way to get out?  It didn't

10   even enter my head.  It's hard to explain, Your Honor.  Like I

11   said, I thought I was in there for two minutes, and I was told

12   it was 15 minutes.  And I accept that.

13      But when I was pushed in, I don't know if it was adrenalin.

14   I don't know if it was chemical irritants.  I don't know what it

15   was.  But I did not perceive a way out of there.  And I talked

16   to the police officers, and from what I can remember is they

17   motioned for me to walk out to the right, which is what I did.

18         THE COURT:  What did you say to the police officers?

19         THE DEFENDANT:  What did I say to them?  So I recall

20   saying three things:  One, the same thing I said on the lawn,

21   something along the lines of "y'all need to go home" or

22   something like that.  That's when the officer replied, "Do you

23   know what would happen if we did that?"  And that's when it

24   started clicking for me.  And then I said, "Well, you would need

25   to get ahold of Trump."  And he said, "You would have as good a

1    chance of getting ahold of Trump as I would."  And then I said,

2    "Well, contact your superior officer," because I noticed he had

3    like a microphone on his chest.

4        And I don't know how much time passed, but it seemed like

5    it was pretty quick where he motioned for that mic and said

6    something.  I couldn't hear what he said.  And the next thing I

7    remember is being motioned out to my right at the time.

8            THE COURT:  Do you remember there sort of chanting and

9    your hands moving?  It's in the video.

10           THE DEFENDANT:  No.  But if I did that, I can't argue

11   with it.

12           THE COURT:  Okay.  Well, again, Mr. Shough, it's a

13   little frustrating from where I sit that you can remember in

14   detail the conversation you had with the officers, but somehow

15   you can't remember anything just outside the door when you

16   enter, nor can you remember anything about celebrating.

17       And it's all of the points that implicate you that you have

18   a blank on, but the parts that -- these other parts you remember

19   in great detail.  If you're affected by pepper spray or whatever

20   the case may be, I don't understand why you have these clear

21   moments of recollection where you can remember the back and

22   forth with the police officer but you can't remember anything

23   else around that time.

24           THE DEFENDANT:  What I remember is just what was right

25   ahead of me.  I think that's the affect of adrenalin.  You kind

```
1    of get tunnel vision.  Like I said, I could say the opposite,
2    but that's not going to sit right with me.
3              THE COURT:  Okay.  I understand.
4         Is there anything else you would like to say?
5              THE DEFENDANT:  No, Your Honor.  Thank you for
6    allowing me to provide a statement.
7              THE COURT:  Is there anything additional you would
8    like to say, Ms. Spearman?
9              MS. SPEARMAN:  No, ma'am, nothing additional.  We do
10   have the statement if the Court would like it as a part of
11   the --
12             THE COURT:  It's your decision.  It needs to be filed
13   on the public record, though.
14        There is a public record of what you said, Mr. Shough.  You
15   don't have to file this, but if you want to file something, I
16   will accept it.
17        Does the government have any objection to him filing
18   something now?
19             MR. KONIG:  No, Your Honor.
20             THE COURT:  Would you like to see it before it's
21   filed?
22             MR. KONIG:  No, Your Honor.
23             THE COURT:  And you don't have to decide right this
24   moment.  All right?  But if it's -- if you want it filed as a
25   record, you may do so.
```

1           MS. SPEARMAN:  Thank you.  Nothing further.

2           THE COURT:  I'm sorry.  I'm going to have to take a

3  five-minute break.  I had a 3:30 matter that I need to reach out

4  to someone to see if I can talk to them in 20 minutes or so.  So

5  I want to e-mail them.  And you're welcome to go to the

6  bathroom, and I will come back and give the reasons for my

7  sentence.

8       So we will come back at 5 after 4:00.

9       (Recess taken from 3:59 p.m. to 4:07 p.m.)

10          THE COURT:  All right.  Is there anything additional

11  either side would like to say before the Court gives its reasons

12  for sentence here?

13          MS. SPEARMAN:  No, Judge.  Nothing from defense.

14          MR. KONIG:  Nothing from the government, Your Honor.

15          THE COURT:  All right.  In addition to considering the

16  guidelines, which we've discussed, I'm also required to consider

17  the various factors outlined in Title 18 United States Code

18  Section 3553(a) in deciding what sentence to impose here.  I

19  have done so.  I'm going to focus on those the Court finds most

20  significant.

21      First, looking at the nature and circumstances of the

22  offense, like all the Capitol riot cases, this is a very serious

23  offense.  Mr. Shough has entered a plea of guilty to a felony

24  civil disorder offense in connection with the unprecedented

25  events of the January assault on our Capitol.

1    It's clear to the Court that that day, after attending the

2    Stop the Steal Rally on The Ellipse, Mr. Shough joined rioters

3    on the west side of the Capitol.  He says that he didn't realize

4    that the grounds were restricted that day.

5    It is hard for the Court to understand that, given the

6    large number of barriers and signs that were posted that day,

7    and also the fence netting that was -- Mr. Shough admits was on

8    the ground.  The explanation he gave here today as to why he

9    thought it was on the ground is simply not credible to the

10   Court.

11   Mr. Shough was wearing gear that the government

12   characterizes as tactical gear.  Mr. Shough says that some of

13   this served a dual purpose, both to protect him biking and also

14   to protect him in the event there was a need to defend himself

15   from Antifa or anyone else.  Just for the record, this included

16   a body armor-type vest, a helmet.  The government describes it

17   as ballistic style.  It did have a Oath Keepers sticker or patch

18   or something on it.  The defense describes this as a biking

19   helmet.  He also wore reinforced gloves of some type that he

20   says were dual purpose gloves.

21   The physical evidence shows that he cheered, on the video

22   evidence on the west lawn, as other rioters were being violent

23   and trying to get around Capitol Police officers who were

24   guarding the Capitol building that day.  Video evidence also

25   shows him helping others climb the walls around the Capitol.  He

encouraged others.  He carried a Texas flag, appeared to be

celebrating outside the video.

We've discussed the video in which he seems to indicate an

intent to get inside and let the officers know that they need to

go to let millions come inside the Capitol.

The physical evidence, the video evidence also shows he was

a part of the breach of the West Senate Doors.  This is the

second breach.  He was very near the front of a large mob that

breached the West Senate Doors for a second time.

It's difficult to see clearly from the video the role he

played as he entered the Capitol.  Mr. Shough claims he stumbled

into the Capitol doors and was, for lack of a better word --

this is the Court's word, but I think it captures what

Mr. Shough was conveying to the Court -- that he was in kind of

a stupor when he was in the midst of that scrum, that violent

scrum.  And although he admits he intended to go into the

Capitol that day, he pretty firmly tells the Court that he

didn't -- he was just sort of carried along and pushed along by

the crowd around him.

There's no question that once inside the Capitol, he did

engage with the Capitol Police in an animated manner.  He's

described what he said about -- in some detail what he said to

the officers about needing to call the president, or their

supervisors need to call the president in order to allow them to

stand down.

1    The Court did view the video evidence carefully several

2    times, and it did seem to the Court that he was chanting, if not

3    chanting, his arms were moving out -- as his body was partially

4    out of the video.  It's not critical to the Court's ruling, but

5    that he was also celebrating as others in the mob chanted once

6    they were inside the Capitol.

7    The Court just cannot fully credit Mr. Shough's explanation

8    that he stumbled inside the Capitol as he was pushed from

9    behind.  Yes, the force of the mob was no doubt strong, but it's

10   clear to the Court that Mr. Shough came to the Capitol intending

11   to enter the building that day.  He says the gear he wore was

12   for other reasons, and the face covering he pulled up was for --

13   just in order to comply with the COVID restrictions that were in

14   effect in government buildings.

15   I'm not, by the way, crediting the government's proffer

16   here that he had a knife on him.  I have not had time to go back

17   and look at that photograph, and Mr. Shough denies it, and so

18   I'm not considering that either way here.

19   But it is clear to me, given all the circumstances, you

20   know, again, where Mr. Shough positioned himself, what he did

21   before he was just outside the Capitol door that had already

22   been breached once and, you know, reinforcements had been

23   brought to keep that door shut, given the way he helped others

24   to try to enter the Capitol, I'm just not convinced he was just

25   a mere bystander there who was just carried by the mob into the

1  Capitol.

2      He himself admits he intended to go in.  But I guess the

3  distinction is he didn't intend to be a part of this sort of

4  forceful mob.  He has admitted under oath at the time of the

5  plea that he did forcibly and unlawfully enter the U.S. Capitol

6  building.

7      So we may be splitting hairs here, but the point is, he put

8  himself in a position that was very obvious to everyone around

9  him, if not himself, what was going to happen, and I just can't

10  credit what he's saying about being in a complete daze, given

11  the details he can remember just moments later once he was in

12  speaking with the officers.

13      So the bottom line is, I don't find his statement that he

14  merely stumbled into the Capitol credible and that he wasn't

15  intending to be a part of that scrum as it came in.

16      What makes this case an incredibly tough case is

17  Mr. Shough's background.  And this is captured, I think, quite

18  well in all the letters that have been submitted on his behalf.

19  It is very clear to the Court that Mr. Shough has the strong

20  support of his family and friends.  I'm going to mention some of

21  the most compelling portions of these letters that I read

22  carefully.

23      Starting first with the letter of the uncle of his

24  girlfriend, not fiancee, I don't think --

25      MS. SPEARMAN:  Girlfriend.

1          THE COURT:  The uncle talks about how hard working,

2    committed, and compassionate Mr. Shough is and how concerned he

3    is about the adverse impact that this has had on others and not

4    so much himself, and that he thinks of himself last, and how

5    profoundly remorseful he is for the awful situation he was

6    caught up in and how very much out of character this is for him.

7    And I credit that.

8          I also think that this is a part of why it makes it so

9    difficult for Mr. Shough to own some aspects of his conduct that

10   day, that it is just very hard for him to admit the wrong that

11   he committed on that day.  And I think he feels great shame

12   about it, and yet, I can't credit every explanation he's given

13   for the moments that led up to him being inside the Capitol, for

14   the reasons I've already given.

15         The rancher who met Mr. Shough wrote a lengthy letter

16   talking about the way in which Mr. Shough helped him install a

17   beadboard ceiling at his house and how he declined payment for

18   it, and talked about the relationship they developed and the way

19   in which Mr. Shough helped him in other ways with his land to

20   make campsites.

21         And he also explains how Mr. Shough sent him an e-mail

22   later apologizing for not telling him the truth about why he had

23   taken a leave of absence from work to come out to Terralingua

24   and that he had been involved in the January 6 protests.

25         Again, I think this is an example where it's very hard for

1   Mr. Shough to admit wrongdoing.  And it doesn't mean he's not a

2   genuinely good, decent person.  Good people make mistakes, and

3   he does not need to define himself by this one instance.

4       Talking about the letters from his parents, his mom talks

5   about the support he's given friends to start a business and the

6   ways in which he's encouraged others, including her, to further

7   their education, and what a hard worker he is, and how much he

8   supported his uncle who was fighting Parkinson's disease during

9   the pandemic and cared for him deeply and did so with, you know,

10  encouragement and compassion.

11      His father writes the same about his deep empathy and the

12  way in which he's helped him with his cleaning company and

13  encouraged him to stay the course, and how much Mr. Shough

14  looked up to his uncle as a father figure and as a mentor, and

15  also about how it's very difficult for Mr. Shough to show his

16  emotions outwardly.

17      And I think Mr. Shough's really hard on himself and wants

18  to be perfect, the perfect individual.  And again, people make

19  mistakes, and there are consequences for those mistakes, and it

20  doesn't mean that Mr. Shough is a bad person.

21      Finally, the letter of the brother and the girlfriend

22  echoes many of the comments the others have made about how hard

23  working and generous he is, also how much they are going to be a

24  support to him.

25      His girlfriend talked about how he stayed up one night with

one of his neighbors who is in recovery from addiction to make
sure he was okay, and how much he would do for others to cook
food and drive folks to and from the doctor's office.  He does a
great deal for many, many people.  She talked about how he gives
homeless people spare cash.

By all accounts, he's one of the most caring, humble, and
genuine people all of these folks have ever met, and I don't
think what -- anything he's done here takes away from that.

Yet, I do have real trouble finding him completely honest
with himself and with the Court about what happened on
January 6.  And I think that's something he's going to have to
come to terms with in life, is being able to admit mistakes and
not be perfect, and none of us is, but that's going to limit
Mr. Shough's ability to live fully and come to terms with this
chapter in his life.

His background makes this incredibly tough, as I've said,
for the Court.  As I've said already, Mr. Shough is not the
first to completely puzzle the Court.  And I hear what
Mr. Shough thinks and believes about Russian interference.  And
I'm not going to take a stand on that one way or the other.
Assuming it's all true, it still doesn't negate what he did on
January 6.  He did and has to take accountability for the steps
he took to get inside the Capitol.  And it was of his own free
will.  I cannot accept that he was pushed in the Capitol,
considering all the circumstances as a whole.  I just can't.

1    We've discussed in great detail the other cases that have

2  been identified by the parties, including at least one that's

3  been sentenced by the Court.  I'm not going to belabor this

4  point here.

5    The government has recommended a sentence of 11 months.

6  Probation has recommended a sentence of eight months.  I might

7  be inclined to follow probably not the government's

8  recommendation, not because I don't understand it, and I think

9  it's proportional and commensurate with other cases that have

10  been brought into this Court.  It's just not quite in line with

11  what this judge has done.

12    And again, Mr. Konig, I commend you.  I think you've made a

13  fair recommendation in this case.  But it's not quite in line

14  with where I've sentenced folks that have been involved with

15  January 6 events.

16    Probation's recommendation is more in line with where the

17  Court is.  And yet, I do think, looking at the circumstances as

18  a whole, it too, considering other cases, namely Judge Hogan's

19  case and Judge Boasberg's case, I think it's also a little bit

20  high.

21    But considering all of the goals of sentencing, considering

22  the nature of the offense and the other relevant factors, I

23  believe that a sentence of six months' imprisonment with one

24  year of supervised release and community service of 200 hours

25  will be sufficient but not greater than necessary to achieve the

1     goals of sentencing.

2          I believe it's adequate punishment.  I believe it will

3     protect the community and fulfill the goals of deterrence, both

4     specific and general.

5          I will now read the formal sentence of the Court, and I

6     will give both parties a chance to object as well as Probation

7     before I order that this sentence be imposed.

8          All right.  Pursuant to the Sentencing Reform Act of 1984

9     and in consideration of the provisions of Title 18 United States

10    Code Section 3553, as well as the advisory sentencing

11    guidelines, it is the judgment of the Court that you, Geoffrey

12    Samuel Shough, are hereby committed to the custody of the Bureau

13    of Prisons for a term of six months on Count 1.

14         You're further sentenced to a term of one year of

15    supervised release as to Count 1.  In addition, you're ordered

16    to completed 200 hours of community service during your period

17    of supervision.

18         You're also ordered to pay a special assessment of $100.

19         While on supervision, you shall abide by the following

20    mandatory conditions as well as the discretionary conditions

21    recommended by the Probation Office in Part D of the sentencing

22    options of the presentence report.

23         Ms. Spearman, do I need to review those with Mr. Shough

24    here on the record?

25              MS. SPEARMAN:  No, you do not, but may I clarify?  You

said 100 hours of community service, and you just said 200

hours.

THE COURT:  Oh, did I say -- I meant to say 200 on

both occasions.

The mandatory conditions include not committing another

federal, state, or local crime, not unlawfully possessing a

controlled substance, refraining from any unlawful use of a

controlled substance, submitting to a drug test within 15 days

of placement on supervision, cooperating in the collection of

DNA as directed by Probation, and making restitution in

accordance with the plea agreement, which I believe is $2,000

restitution.  All right.

You shall comply with the following special conditions:

You most provide the probation officer access to any requested

financial information and authorize the release of any financial

information.  The Probation Office may share that with the U.S.

Attorney's Office.

I'm not going to order a re-entry progress hearing.

What is the government's position on a fine?

MR. KONIG:  We're not requesting a fine.

THE COURT:  All right.  I will decline to impose a

fine in this case in light of the other punishment the Court has

imposed and the restitution as well.

The Court's determined that you don't have the ability to

pay the fine and interest in a timely fashion.  I will waive

1    interest or penalties on any that might accrue on the balance.

2        I do recognize that Mr. Shough does have some net worth,

3    but I want restitution to be the priority here, not the fine.

4        The restitution in the amount of $2,000 shall be made to

5    the Architect of the Capitol.  And you must pay the balance of

6    any restitution that's not made immediately to the Clerk of

7    Court at a rate of no less than $75 each month.

8        Probation generally requires this while he's on supervision

9    as opposed to serving a sentence of imprisonment; correct?

10            PROBATION OFFICER:  Correct.

11            THE COURT:  So that's once you're released.  The

12    financial obligations otherwise are immediately payable to the

13    Clerk of Court.

14        The Probation Office shall release the presentence report

15    as required to any other agencies.

16        Mr. Shough, to the extent you have not validly waived your

17    right to appeal either the conviction or the sentence imposed by

18    the Court, you must do so within 14 days of the date the Court

19    enters judgment.  And if you can't afford the cost of an

20    attorney, one will be appointed for you.

21        Before I order that this sentence be imposed, does

22    Probation have any issues with the sentence as announced?

23            PROBATION OFFICER:  No, Your Honor.

24        Are you maintaining jurisdiction?

25            THE COURT:  I am going to maintain jurisdiction, but I

```
 1    will transfer supervision to -- is it the Western District of

 2    Texas?  All right.

 3        Mr. Konig, is there any objection from the government?

 4            MR. KONIG:  No, Your Honor.

 5            THE COURT:  All right.  Ms. Spearman?

 6            MS. SPEARMAN:  No objection, but we request a

 7    recommendation for placement at FCI Bastrop.  It's in the Austin

 8    area.

 9            THE COURT:  Okay.  I will make that recommendation.

10            MS. SPEARMAN:  Thank you.

11            THE COURT:  There's no objection to Mr. Shough

12    self-surrendering; right?

13            MR. KONIG:  No, Your Honor.

14            THE COURT:  All right.  So he should be in touch with

15    Probation.

16        Mr. Hopkins is looking because I've omitted something.  Is

17    there a motion from the government?

18            MR. KONIG:  Yes, there is.  The government moves to

19    dismiss Counts 2 through 5 of the indictment.

20            THE COURT:  Okay.  Any objection?

21            MS. SPEARMAN:  No objection.

22            THE COURT:  I will dismiss those counts pursuant to

23    the government's motion.

24        And, Mr. Shough, I wish you the best.

25        (Proceedings adjourned at 4:29 p.m.)
```

CERTIFICATE OF OFFICIAL COURT REPORTER

I, Sara A. Wick, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/ Sara A. Wick                    June 23, 2023
SIGNATURE OF COURT REPORTER         DATE